A contractor, Stone Building Company (hereinafter "Stone"), appeals an adverse summary judgment on its cross-claim against a subcontractor, Star Electrical Contractors, Inc. (hereinafter "Star"), for Stone's expenses in defending and settling the main action filed by Dennis Cline and his wife for injuries Dennis suffered on the job site on August 6, 1991. In order to procure an electrical subcontract dated *Page 1078 
April 20, 1990, Star had promised to obtain liability insurance covering Stone and to "indemnify and save harmless and exonerate" Stone if it were sued for injuries resulting from the job. After Cline suffered his job-site injuries; and after he and his wife sued a number of entities, including Stone and Star, by successive pleadings filed over the course of several years; and after Stone filed cross-claims against Star on the basis of its promises to Stone; and after Stone and Star filed motions for summary judgment against each other on Stone's cross-claims against Star; and after the trial court considered the record that had accumulated over the course of seven years of litigation and considered the arguments of counsel, the trial court entered summary judgment in favor of Star. We affirm in part and reverse and remand in part that summary judgment.
The subcontract between Stone and Star reads, in pertinent part, as follows:
 "Section 8. The Subcontractor will maintain such insurance as will protect him and the Contractor from
claims under Workmen's Compensation Acts and any other claims from property damage and claims for bodily injury, including death, which may arise from operations under this Contract, whether such operations be by himself or any of his subcontractors or anyone directly or indirectly employed by either of them. Limits of coverage to be as follows:
". . . .
 "Indemnity Agreement: The Subcontractor covenants to indemnify and save harmless and exonerate the Contractor and the Owner of and from all liability, claims and demands for bodily injury and property damage arising out of the work undertaken by the Subcontractor, its employees, agents or its subcontractors, and arising out of any other operation no matter by whom performed for and on behalf of the Subcontractor, whether or not due in whole or in part to conditions, acts or omissions done or permitted by the Contractor or Owner."
(C.R. 469, emphasis added.)
While installing drywall on this job in the employment of another subcontractor, Cline's metal tape-measure touched a live, uninsulated electrical wire, and the consequent shock injured him and caused him to fall from his ladder and to suffer injuries from his fall as well. Through an original complaint, dated July 2, 1992, and successive amendments, Cline and his wife sued a number of defendants, including Stone and Star.[1] Adding Stone as a defendant in an amendment to the complaint dated September 9, 1992, the Clines alleged:
 "On said date and occasion, the Defendant, STONE, negligently and/or wantonly planned, supervised, and/or executed remodeling, renovation, and/or repairs of the site of the occurrence made the basis of this lawsuit, in that STONE negligently and/or wantonly caused or allowed charge[d] and exposed electrical wires to be present and unprotected, and failed to warn and/or protect the Plaintiff, DENNIS R. CLINE, or others, of and from such dangerous condition. STONE knew or should have known that the Plaintiff, *Page 1079 
DENNIS R. CLINE, and others, would be in and about the immediate area of the charged and exposed wires, and owed a duty to the Plaintiff, DENNIS R. CLINE, to warn him of such dangerous condition. As a proximate cause of such negligent and/or wanton conduct and breach of duty, the Plaintiff, DENNIS R. CLINE, was caused to suffer the injuries and damages described hereinafter."
(C.R. 15, emphasis added.) Adding Star as a defendant on March 2, 1995, the Clines amended three paragraphs of their original complaint. Two of the amended paragraphs are pertinent:
 "17. The plaintiffs aver the defendant, Star Electrical Contractors, Inc., (Star) was the subcontractor involved in the construction of the site of the occurrence made the basis of this lawsuit. During or after the aforesaid construction, Star negligently and/or wantonly left, allowed or caused a charged, naked and uninsulated electrical wire formerly in place on the fifth floor to hang into the ceiling space of the fourth floor with which Dennis R. Cline made contact through a metal tape measure on August 6, 1991.
 "20. The plaintiff, Dennis R. Cline, alleges that his injuries and damages were caused as a proximate consequence of the combined and concurring negligence
and/or wanton conduct of the defendant, Stone . . ., a general contractor; 4 Star Electric Company, Inc., a subcontractor; Star . . ., a subcontractor; Mutual Assurance, Inc., a corporation; Capital Properties, Inc., a corporation; Garikes, Wilson, Atkinson, Inc., an architectural corporation; and defendants remaining who are fictitiously described in the last amendment to the complaint."
(C.R. 107-08, emphasis added.) During the course of the litigation, the Clines produced sufficient evidence supporting these allegations against Star to withstand three motions for summary judgment before trial and two motions for judgment as a matter of law during trial, before a jury eventually found in favor of Star on the Clines' claims.
In the process of defending the suit by the Clines, on September 17, 1997, Stone filed its cross-claim against Star. There Stone alleged, in pertinent part:
 "4. While Defendant/Cross-Claim Plaintiff, Stone, denies that it is liable to Plaintiffs under any theory alleged in the Plaintiffs' Complaint, nevertheless, Stone says that if it is determined that it is liable to Plaintiffs, then Stone is entitled to indemnity from Star . . . for any liability.
 "5. On or about April 20, 1990, Star . . . entered into an agreement whereby Star . . ., as the Subcontractor, agreed to furnish all labor, materials and fully perform and in every respect complete the electrical work for the project of Mutual Assurance, located at Metroplex IV Building, Birmingham, Alabama 35209. A copy of that agreement is attached as Exhibit 1 to plaintiffs' Narrative Summary in Opposition to the Motion for Summary Judgment of Defendant, Star. . . . A copy of which is attached hereto, made a part hereof, and incorporated herein by reference as Exhibit A. (Emphasis in original.)
 "6. Section 8 of the contract agreement between Stone and Star . . . provides as follows:
 "Indemnity Agreement: The subcontractor, [Star] covenants to indemnify and save harmless and exonerate the Contractor [Stone] and the Owner of and from all liability, claims and demands for bodily injury and property *Page 1080 damage arising out of the work undertaken by the Subcontractor, its employees, agents or its subcontractors (emphasis added), and arising out of any other operation no matter by whom performed for and on behalf of the Subcontractor, whether or not due in whole or in part to conditions, acts or omissions done or permitted by the Contractor or Owner. (Emphasis in original.)
 "7. Plaintiff alleges that pursuant to the contract between Stone and Star, Star was responsible for the demolition and removal of the existing electrical conduit, wiring, boxes, etc. which serviced the fifth floor. (See Plaintiffs' Exhibits 2 and 2A attached to Plaintiff Narrative Summary in Opposition to the Motion for Summary Judgment of the Defendant, Star . . . .).
". . . .
 "9. Plaintiff alleges that Star breached its contractual duty to Stone thereby creating a dangerous condition as a proximate result of which the plaintiff suffered injuries for which he claims damages in this action.
 "10. A justiciable controversy exists regarding the existence of any potential liability on Stone's part to Plaintiffs arising from the August, 1991 accident, and regarding defendant Star['s] . . . duty to indemnify and hold harmless Stone from any liability arising out of said accident.
 "WHEREFORE, premises considered, Stone requests that the Court enter an order declaring that Stone has no liability to Plaintiffs arising from the August 1991 accident. In addition, or in the alternative, Stone requests that the Court enter an order declaring that defendant, Star . . ., has a duty to indemnify it and hold it harmless against any and all loss, cost, expense, claim, fines, penalties, and liability (including but not limited to attorneys' fees) arising from the August 1991 accident, referenced in Plaintiffs' complaint. Stone further demands judgment against defendant, Star . . ., in the amount to be determined by a jury, of all loss, cost, expense, claim, fines, penalties, and liability (including but not limited to attorneys' fees) to or incurred by Stone . . . as a result of the August 1991 accident up through the date of judgment. Stone . . . also prays for such other, further, or additional relief which the Court deems proper in the circumstances."
(C.R. 511-13.) Stone later amended this cross-claim on June 30, 1998, to include the following claims:
 "6. The contract, in section 8, which pertains to the indemnity agreement made the basis of Stone's original cross-claim, further provides as follows:
 "Certificates of Insurance: The subcontractor (Star) will submit to the Contractor (Stone) five (5) copies of certificates of insurance certifying that the insurance policies carried by him were in force. . . .
 "7. On or about February 6, 1991, Star complied with its contractual duties to indemnify and obtain insurance for Stone's benefit and, by and through the Greenhalgh Insurance Agency, provided Stone with a Certificate of Insurance. A copy of the Certificate of Insurance is attached hereto, made a part hereof, and incorporated herein by reference as exhibit 2.
 "8. At all times material hereto and specifically prior to the March 20, 1998 letter of Star's counsel of record referenced below, Stone believed that the attached Certificate of Insurance provided Stone . . ., under section 8 of the April 20, 1990 Uniform Subcontract agreement, the following insurance coverages with Pennsylvania National Insurance *Page 1081 
Company: General Commercial Liability (CGL) under policy no. CL9 0007455-0 of an aggregate of $1,000,000.00 and for each occurrence $500,000.00; and excess liability under policy no. UL9 0007455-0 an aggregate of $2,000,000.00 and for each occurrence $2,000,000.00.
 "9. Stone contends that the above coverages apply to the claims of the plaintiffs Dennis and Vera Cline made the basis of this case. At all times material hereto and specifically prior to March 20, 1998, Stone believed that it was an additional insured under the above insurance policies with Pennsylvania National Insurance Company and that Star had complied with Star's contractual duties by providing coverage to Stone with Pennsylvania National.
 "10. On or about March 13, 1998, Stone, by and through undersigned counsel, wrote counsel for Star demanding that Star and Pennsylvania National Insurance Company provide insurance, coverage, defense, indemnity, and otherwise hold Stone harmless with regard to the claims of Dennis and Vera Cline. A copy of the March 13, 1998, demand letter is attached hereto, made a part thereof, and incorporated herein by reference as exhibit 3.
 "11. Subsequent to March 13, 1998, and in part because of a lack of response to the demand letter, Stone, by and through its undersigned counsel, on March 19, 1998, wrote to Pennsylvania National Insurance Company and its agent Greenhalgh Insurance Agency a certified demand letter demanding coverage, defense, indemnity, and hold [sic] harmless of Stone pursuant to the April 20, 1990 Uniform Subcontract and the February 6, 1991, Certificate of Insurance. A copy of the March 19, 1998, demand letter is attached hereto, made a part hereof and incorporated herein by reference as exhibit 4.
 "12. On March 20, 1998, one day after the certified demand letter and seven days after the March 13, 1998 demand letter, counsel for Star wrote counsel for Stone in response to the demand letter of March 13, 1998. Counsel for Star's letter makes the following representations: (1) that the February 6, 1991, Certificate of Insurance indicated that only Star . . . had insurance coverage and not Stone . . .; and (2) that both Star . . . and Pennsylvania National Insurance Company were denying Stone's demands for insurance coverage, defense, and indemnity. A copy of the March 20, 1998 denial letter is attached hereto, made a part hereof, and incorporated herein by reference as exhibit 5.
". . . .
 "14. Defendant/Cross-Defendant Star has breached section 8 of the April 20, 1990 Uniform Subcontract by failing and refusing to provide insurance coverage, defense, indemnity, and to hold harmless Stone . . . with respect to the claims of Dennis and Vera Cline.
 "WHEREFORE, PREMISES CONSIDERED, Stone demands judgment against Star for compensatory damages as the jury may award, interest, and costs.
". . . .
 "16. The material representations made to Stone that Star would maintain insurance for Stone as contained in section 8 of the April 20, 1990 Uniform Subcontract, are, according to counsel for Star's March 20, 1998 letter, false and were made intentionally with knowledge of their falsity, recklessly without knowledge of their falsity, recklessly without knowledge, or innocently and by mistake. *Page 1082 
 "17. In reliance on the said misrepresentations, Stone entered into the April 20, 1990 Uniform Subcontract and paid Star the sum of $274,832.00. Stone believed Star was maintaining insurance coverage for Stone as an additional insured in accordance with Star's contractual duties under section 8 of the April 20, 1990 Uniform Subcontract.
 "18. As a proximate consequence of defendant Star's misrepresentations, Stone has been injured in that Stone was required to pay additional money, fees, and charges to Star while believing that Star had complied with section 8 of the Uniform Subcontract and obtained insurance for Stone as evidenced by the February 6, 1991, Certificate of Insurance with Pennsylvania National Insurance Company and by and through the Greenhalgh Insurance Agency. Stone has otherwise been injured and damaged by the foregoing wrongful conduct of Star.
 "WHEREFORE, PREMISES CONSIDERED, Stone prays for judgment against Star for such compensatory and punitive damages above the jurisdictional minimum of this court as the jury may award, interest and costs.
". . . .[2]
 "28. Defendant Star negligently, wantonly, and/or recklessly failed to obtain insurance coverage to protect Stone from claims for bodily injury like that claimed by plaintiffs Dennis and Vera Cline as is required under section 8 of the April 20, 1990 Uniform Subcontract.
 "29. As a proximate consequence of Defendant Star's negligence, wantonness, and/or recklessness Stone was injured and damaged as aforesaid.
 "WHEREFORE, PREMISES CONSIDERED, Stone prays for judgment for such compensatory and punitive damages as the jury may award, interest and costs."
(C.R. 1185-91, emphasis added.)
On March 13, 1998, Stone sent Star a letter stating:
 "In light of the fact that the expected testimony which will be evaluated by the Judge or Jury in this case has now been substantially finalized, please accept this letter as our demand, on behalf of Stone . . ., that Star . . . and Pennsylvania National Insurance immediately provide coverage to, defend, indemnify, hold harmless, and otherwise exonerate Stone with regard to the claims of Dennis and Vera Cline in reference to the above-captioned suit.
 "The April 20, 1990 Uniform Subcontract between Star . . . and Stone . . ., contains, among other items, Section (8) which provides as follows:
 "Section 8. The Subcontractor will maintain such insurance as will protect him and the Contractor from claims under Workmen's Compensation Acts and any other claims from property damage and claims for bodily injury, including death, which may arise from operations under this Contract, whether such operations be by himself or any of his subcontractors or anyone directly or indirectly employed by either of them.
 "It is our understanding that under Certificate of Insurance with Pennsylvania National Insurance Company, policy number CL9 0007455-0, Stone . . . had commercial general liability coverage of $500,000.00 and excess liability coverage *Page 1083 
under policy number UL9 0007455-0 of $2,000,000.00.
 "Section (8) of the Uniform Subcontract also provides as follows:
 "Indemnity Agreement: The Subcontractor (Star . . .) covenants to indemnify and save harmless and exonerate the Contractor (Stone . . .) and the Owner of and from all liability, claims and demands for bodily injury and property damage arising out of the work undertaken by the Subcontractor, its employee, agents or its subcontractors, and arising out of any other operation no matter by whom performed for and on behalf of the subcontractor, whether or not due in whole or in part to conditions, acts or omissions done or permitted by the contractor (Stone . . .) or owner.
 "Pursuant to the case decision of Davis Constructors and Engineers, Inc. v. Hartford Accident and Indemnity Company, 308 F. Supp. 792 (M.D.Ala. 1968), Stone . . . is entitled to indemnity not only as concerns the plaintiffs' claims relating to the injury and duties arising from the contract between Stone . . . and Star . . . as alleged by the plaintiff, but, also for injuries and incidents that might arise `whether or not due in whole or in part to conditions, acts or omissions done or permitted by the Contractor.' Under the authority of Davis Constructors and Engineers, Inc., this language of the Uniform Subcontract between Stone . . . and Star . . . legally satisfies the requirement that Star . . . and its insurance carrier, Pennsylvania National Insurance Company, intended to indemnify Stone not only for its liabilities resulting from the work performed under the Subcontract and/or the non-feasance or malfeasance of the subcontractor but as well for Stone's own negligence, by its non-feasance or malfeasance.
 "Based on the foregoing separate and independent reasons, we request that Star . . . and Pennsylvania National Insurance Company provide coverage to, undertake the defense of, agree to indemnify, hold harmless, and otherwise exonerate Stone . . . in the above-referenced litigation."
(C.R. 2474-75, emphasis added.) In a letter dated March 20, 1998, Star responded:
 "We are in receipt of your letter of March 13, 1998 demanding that Star . . . and Pennsylvania National immediately provide coverage to, defend, indemnify, hold harmless and otherwise exonerate Stone . . . with regard to the claims of the plaintiff in the above-styled case. Please allow the following to serve as our response to said demand on behalf of Star. . . .
 "We have forwarded your letter on to Pennsylvania National and have been advised by them that they have no record of Stone . . . being an insured. If you have a document that indicates that Stone is an insured under the policy please send it on and we will pass it on to the carrier. We are advised by the carrier that the certificate of insurance that you reference is not a document that creates an insured/insurer relationship with Stone. The certificate is simply a certification that Star . . . did have coverage, not that Stone had coverage.
 "Both Star . . . and Pennsylvania National decline Stone's demand for a defense in this case. Nowhere in the contract between Star and Stone is there an agreement to defend Stone in regards to this or any other lawsuit.
 "You have cited the Davis Constructors Engineers, Inc. case as support for the demand made by Stone. Your *Page 1084 
reliance on that case is misplaced. The Davis Constructors case is clear that the injury at issue must arise out of some `operation' performed under the subcontract. There is not a shred of evidence that anything done by Star . . . under its subcontract with Stone caused or contributed in any way to the injury suffered by the plaintiff in this case. As we have already stated in other pleadings, Stone has suffered no injury nor been subjected to any judgment as a result of any work to be performed or actually performed under the Star/Stone subcontract during the fifth floor construction. As such, your demand for indemnity as relates to Star's work on the fifth floor construction project is refused.
 "Further, your demand that Star indemnify Stone for its own negligence flies directly in the face of present Alabama law. As you know, under the holdings of Harsco Corp. v. Navistar Int'l Trans. Corp., 630 So.2d 1008, 1011 (Ala. 1993) and Industrial Tile v. Stewart, 388 So.2d 171, 176 (Ala. 1980), an indemnity agreement must contain specific and unequivocal language clearly indicating that the parties intended for the subcontractor to indemnify the contractor for the negligence of the general contractor. Likewise, if such a clear indication is not present, the subcontractor is not obligated to indemnify the general contractor for the general contractor's own negligence as the Alabama Supreme Court has stated in Crigler v. Salac, 438 So.2d 1375, 1386 (Ala. 1983).
 "As you also know, there is evidence in this case of negligence on the fourth floor job, separate and completely unrelated to the Star fifth floor contract. Star . . ., under the provisions of the fifth floor subcontract, has no obligation to Stone for such omissions or commissions as may have occurred in the progress of the fourth floor work. Stone's recourse for any failure in performance of the electrical subcontract work to be done on the fourth floor is against Four Star Electric, whose insurance coverage is still in place and is available to defend Four Star from the claims of Stone.
 "You and your client have adopted the arguments presented by Star . . . for summary judgment as to that aspect of the case that deals with the fifth floor work. Our motions are due to be granted thereby relieving Stone and Star of any and all liability for the fifth floor work. Your demand for indemnity should be addressed to such parties as may be responsible to Stone for the fourth floor job.
 "Following the last mediation, I was given settlement authority of $100,000. That authority still remains in place and will be available until such time as our motion for summary judgment is ruled on. It is available toward settlement of the case as to ALL claims against Star so as to obtain a complete dismissal of Star in the case."
(C.R. 2485-86, emphasis added.)
On July 22, 1998, the Clines (through counsel) sent Stone a letter containing a settlement demand for $1,750,000.00:
 "I have just completed a review of six and a half years' accumulation of depositions, expert witnesses' testimony, medical records, etc., in order to give as educated an offer of settlement to you as I can. Dennis and Vera Cline are in my office as I dictate this letter and we have just concluded a lengthy discussion about the ups and downs of this case.
 "I expect Fred Johnson to testify to a loss of income, past and future, in the amount of $672,248. As this accident occurred on August 6, 1991, and the amendatory act allowing medical subrogation *Page 1085 
became effective on August 1, 1992, I will be able to claim $242,736 in medical expenses. Of course, at trial time I will file a motion in limine concerning any questions about medical expenses in this case.
 "These two figures combine for a total of $914,984. Therefore, I conclude a reasonable up front settlement offer of $1,000,000 on a structured settlement basis is reasonable.
 "I have checked with Joe Davis and determined the cost of providing Dennis an annuity at 34 years of age to be $3,500 guaranteed for 30 years, or for his life, whichever is longer. No doubt you will check if you care to respond to this offer of settlement. I do not think it untoward, considering the catastrophic injuries to Dennis and his experience in dealing with them, to demand a total of $1,750,000 in this case, with the $750,000 being diminished by whatever rate you can secure on providing the $3,500 on a structured basis. Joe quoted me a cost of $670,609.
 "Needless to say, we all need a speedy resolution or not to determine what wood we have to chop in the future. Therefore, please advise at your earliest convenience."
(C.R. 2506-07.) The following day, by letter, Stone demanded that Star settle the Clines' claims "on behalf of Stone":
 "Please accept this letter in your capacity both as counsel of record for Star . . . in the above entitled action and as the Registered Agent in the State of Alabama for Pennsylvania National Insurance Company.
 "As you are aware, on July 22, 1998, counsel for the Plaintiffs, E. Ray Large, made a settlement demand to settle the above entitled action for $1,750,000.00. A copy of the settlement demand letter is enclosed for your reference.
 "Pursuant to the April 20, 1990, Uniform Subcontract between Star . . . and Stone . . ., Stone requests that Star . . . and Pennsylvania National Insurance Company settle the claims of the Plaintiffs on behalf of Stone.
 "Under the terms of the April 20, 1990, contract, Star . . . made two promises to Stone contained in section (8) of the contract. First, Star promised to maintain insurance to protect Star and Stone from claims for bodily injury which may arise from operations under the contract. Second, Star promised to indemnify and save harmless and exonerate Stone from two separate and distinct risks:
 "(1) from all liability for bodily injury arising out of the work undertaken by Star and arising out of any operation no matter by whom performed for an on behalf of Star, whether or not due in whole or in part to conditions, acts or omissions done or permitted by Stone; and (2) from all claims and demands for bodily injury arising out of the work undertaken by Star and arising out of any operation no matter by whom performed for and on behalf of Star, whether or not due in whole or in part to conditions, acts or omissions done or permitted by Stone.
 "In reliance on these promises, Stone accepted the April 20, 1990, Uniform Contract with Star and paid Star $274,832.00.
 "The claims of Dennis and Vera Cline, as alleged in the Plaintiffs' Complaint and all amendments to same, are alleged to have arisen out of the operations of the April 20, 1990 contract. The insurance provided by Pennsylvania National Insurance Company and set forth in the Certificate of Insurance issued to Stone was issued by Pennsylvania National Insurance Company so that Star could *Page 1086 
comply with its promises to Stone as set forth above.
 "Stone does not wish to be placed at risk by a liability judgment against it concerning the claims of the Plaintiffs Dennis and Vera Cline. Stone, therefore, requests that Star and Pennsylvania National Insurance Company immediately settle the claims of Dennis and Vera Cline under policy numbers CL9 0007455-0 and UL9 0007455-0 as is set forth in the Certificate of Insurance issued to Stone. Since the second risk assumed by Star under the indemnity provision of the April 20, 1990 contract does not require a liability determination, Stone requests that Star and Pennsylvania immediately settle the claims and demands of Dennis and Vera Cline as [set] forth in the enclosed July 22, 1998 settlement demand letter.
 "Stone requests that Star and Pennsylvania National Insurance Company honor the promises made by Star to Stone and settle the claims of the Plaintiffs, and by doing so, protect Stone from any further risk associated in defending itself against the claims of Dennis and Vera Cline in the above entitled lawsuit."
(C.R. 2512-13, emphasis added.) Star did not respond at all to this July 23, 1998 demand by Stone.
On August 17, 1998, Stone sent Star a third letter:
 "As you know, our client, Stone . . ., has agreed to settle and compromise the Plaintiffs', Dennis and Vera Clines', claims and demands for bodily injury alleged against Stone in the above lawsuit.
 "Stone . . . demands that your client, Star . . ., immediately forward to us as Stone's attorneys Star's check or draft made payable to Stone for the sum of $495,000.00 as reimbursement for Star's promise to Stone that Star would indemnify, save harmless and exonerate Stone under the April 20, 1990 agreement."
(C.R. 2520, emphasis added.) Star did not respond. On August 25, 1998, Stone and the Clines finalized the settlement agreement for $495,000.00 to be paid by Stone to the Clines.
After the trial court denied Star's third motion for summary judgment on the Clines' claims against Star, those claims proceeded to trial. There the trial court denied Star's motions for judgment as a matter of law and submitted the Clines' claims to the jury; but, on March 5, 1999, the jury returned a defense verdict in favor of Star, and the trial court entered judgment accordingly for Star on the Clines' claims.
The following September, the trial court decided motions for summary judgment that Stone and Star had filed against each other on Stone's cross-claims against Star. Although the trial court had necessarily found enough evidence that Star itself had negligently injured Cline to defeat all of Star's motions for summary judgment and motions for judgment as a matter of law on the Clines' claims against Star, the trial court misinterpreted the jury verdict in favor of Star on the Clines' claims to signify that, "[t]herefore, there was no evidence that Star, or someone acting `by [or] for and on behalf of' Star, including Stone, negligently committed any acts complained of by Cline for which Stone paid damages and now seeks indemnification." (Trial court order dated September 2, 1999, C.R. 2874.) Accordingly, the trial court "overruled" Stone's motion for summary judgment, granted Star's motion for summary judgment, "dismissed" all of Stone's claims against Star, and certified the judgment as final pursuant to Rule 54(b), Ala.R.Civ.P., as other cross-claims against other entities were still pending. Stone appeals. *Page 1087 
Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Rule 56(c)(3), Ala.R.Civ.P., and Dobbs v. ShelbyCounty Economic Indus. Dev. Auth., 749 So.2d 425 (Ala. 1999). "Our review of a summary judgment is de novo, and in determining whether a summary judgment was proper we must view the evidence in a light most favorable to the nonmoving party. Hightower Co. v. United StatesFidelity Guar. Co., 527 So.2d 698 (Ala. 1988)." Young v. La QuintaInns, Inc., 682 So.2d 402, 403 (Ala. 1996). All reasonable doubts must be resolved in favor of the nonmoving party. Ex parte Ryals,773 So.2d 1011 (Ala. 2000).
 I. STAR'S PROCEDURAL ISSUE
Star contends that the summary judgment in its favor should be affirmed on the ground that Stone filed nothing in opposition to the particular motion for summary judgment granted by the trial court. Stone, however, had previously filed its opposition materials in response to a similar, unsuccessful motion for summary judgment previously filed by Star challenging Stone's same cross-claims; and Stone also filed its own motion for summary judgment, properly supported by evidentiary materials, immediately after Star filed its last motion for summary judgment; and the trial judge considered and decided the two motions for summary judgment — Star's last and Stone's — both directed to Stone's cross-claims against Star — together, and granted Star's and "overruled" Stone's. Thus, Star's contention before us exalts form over substance. Stone's evidentiary materials were properly before the trial court.
 II. THE MERITS
Stone contends that Star breached three primary duties it undertook in its subcontract with Stone: the duty to obtain liability insurance covering Stone; the duty to indemnify Stone for sums it might pay in settlement of, or damages for, claims for job-site injuries suffered by third parties like Cline; and the duty to indemnify Stone for the expenses of its defense of such claims. We will discuss Stone's claims grounded on Star's alleged breaches of those duties seriatim.
 A. The Duty to Obtain Liability Insurance Coverage on Stone
Stone contends that Star failed to provide insurance to cover Stone against liability for the Clines' claims, as required by the 1990 subcontract. Star did, in fact, procure insurance to cover itself but not to cover Stone. Stone alleges breach of contract, misrepresentation, negligent and wanton failure to procure insurance, and negligent and wanton failure to settle.
Jim Cooper, who, as an employee of Stone, executed the 1990 subcontract with Star, stated in his affidavit as follows:
 "I am President of Jim Cooper Construction Company, Inc. in Birmingham, Alabama. During 1989 and 1991, I was employed with Stone . . . as a Project Manager. As part of [the] responsibilities in that position, I would negotiate and execute contracts with various subcontractors for various projects that were contracted to Stone. Included in those duties [was] requesting insurance information from the various subcontractors according to the terms of the subcontract; this was usually followed up by bookkeeping.
 "I am familiar with the subcontract that is attached as Exhibit `A' to this affidavit as it is the subcontract that was executed by me, as an employee of Stone . . . on Stone's behalf with Star. . . . I worked with Tom McEwen of *Page 1088 
Star . . . in getting this contract executed for the electrical work to be done on the Brookwood Metroplex renovation construction project on the Fifth Floor in April, 1990. I am also familiar with the letter that is attached as Exhibit `B' to this affidavit as I signed the letter and had it sent to Star. . . . The letter was sent to Star to request a `blanket certificate' of insurance, which was nothing more than proof that Star had insurance in existence at the time of the contract. I, on behalf of Stone, accepted this `blanket certificate' of insurance from Star's insurance agency as satisfaction of all requirements relating to insurance under the executed subcontract.
 "I am familiar with the terms `additional insured' and `certificate of insurance' as they relate to contractors and subcontractors. It was never my intent, as Stone's employee and representative, to have Stone added as an additional insured under the Star policy. I never requested, nor was I ever instructed to request, that Stone be added as an additional insured under the Star policy. The only requirement that Star had under the subcontract attached as Exhibit `A' was to submit a blanket certificate to me to show that they had the applicable insurance in place. The contract used by Stone, attached as Exhibit `A', was the typical contract used during that period of time with all of Stone's subcontractors. Stone entered into this contract with Star in the same manner as all of the other previous contracts with Star and other subcontractors at the time. Stone did not request that Star in this case, that Stone to be added as an additional insured under the Star policy. Neither was it Stone's practice at the time to make such a request to any subcontractor during that period of time. The subcontract attached as Exhibit `A' and the letter to Star attached as Exhibit `B' set out the intent of Stone to simply have Star submit the `blanket certificate' of insurance proving that Star had its own insurance in place. There was never a requirement that Stone be added as an additional insured under the Star policy of insurance on this April, 1990 subcontract.
 "At some point around the end of 1992, the industry practice changed as far as the insurance requirements in the subcontracts that were used. At that point in time, a different subcontract began to be used by general contractors which specifically required the general contractor to be listed as an `additional insured' in the bottom left hand corner of the subcontractor's certificate. However, when the Star contract was executed, there was no requirement or request made by Stone that they be added as an additional insured under Star's insurance policy. Star's subcontract attached as Exhibit `A' does not require them to do that and is a different subcontract than the one used from 1992 forward. Star's submission of a `blanket certificate' satisfied Star's obligation under the contract as to liability insurance as far as Stone was concerned, as such, the contract was executed by Stone based upon the receipt of the requested blanket certificate."
(C.R. 2232-34, emphasis added.) In the letter referenced as Exhibit "B" in Cooper's affidavit, Cooper requested of Star as follows:
 "Attached please find two copies of a subcontract agreement for the above-referenced job. Please execute both copies of the agreement and return them to our office with insurance certificates showing coverage in the amounts shown and also, have it read as referenced above or provide us with a blanket *Page 1089 insurance certificate. As soon as the executed contracts and insurance are received, we will forward a fully executed copy for your records."
(C.R. 2228, emphasis added.) The initial certificate of insurance names Star as the only insured and names Stone as only the "certificate holder." No certificate of record names Stone as an insured during any coverage period that would include the August 6, 1991 date of Cline's job-site injury. (C.R. 2235-38.)
On the one hand, the text of the subcontract required Star to obtain liability insurance covering both Star and Stone, and the insurance Star did obtain covered only Star and not Stone. On the other hand, Star timely sent Stone the certificate of insurance negotiated and required by Stone's own agent Cooper; this certificate revealed Stone's non-coverage; and Stone accepted the certificate without reservation. While Cooper's affidavit, as parole evidence, cannot contradict the terms of the subcontract, the affidavit can and does establish a waiver of the requirement that Star procure insurance to cover Stone. In fact, Stone did not question or challenge Star about the adequacy of the insurance until Stone amended its cross-claim against Star on June 30, 1998, over seven years after Stone received the certificate of insurance (dated "02/05/91") from Star. Of course, after Cline's injury, Star no longercould procure insurance to cover Stone against the Clines' claims. Thus, had Stone's agent Cooper not waived the requirement for the coverage, Star would have suffered prejudice from Stone's delay in demanding strict compliance with the contract. The legal defects in Stone's contract, fraud, negligence, and wantonness claims against Star grounded on its failure to obtain insurance coverage for Stone are too patent to require further discussion. Accordingly, the summary judgment, insofar as it resolves these claims in Star's favor, is due to be affirmed.
 B. The Duty to Indemnify Stone
Star first argues that the record contained no substantial evidence that any negligence by Star caused Cline's injuries. Star's most voluble argument is that, because its job was located on the fifth floor of the building and Cline was injured on the fourth floor, where the job of another unrelated electrical subcontractor, 4 Star, had been located, Star's conduct could not have caused Cline's injuries. The defect in this argument is that the effects of Star's acts and omissions could extend to the fourth floor. The record does contain substantial evidence that negligence by Star in its electrical demolition work on the fifth floor proximately caused Cline's shock and fall injuries on the fourth floor. Hank Mol, an expert on electrical and construction safety, testified that Star performed all of the electrical demolition on the fifth floor, "including that which ran through the poke-throughs in the ceiling of the fourth floor." (C.R. 2404-05.) Mol testified that the condition of the exposed "hot" wire, running from a panel on the fifth floor down through a poke-through in the fourth floor, was a violation of industry standards as codified in the National Electrical Code. (C.R. 2391-94; 2396-98.) Finally, Mol testified that Star had a duty to inspect the premises after Star had finished its demolition work. (C.R. 2407-08.)
Star next argues that the eventual jury verdict, and the judgment thereon, against Cline on his claims against Star defeated Stone's right to indemnification for the settlement money Stone had paid the Clines for a release from liability for the torts of Star or others in injuring Cline. The subcontract in this case, in Section 8, unambiguously obligated Star to indemnify Stone for "all liability, claims *Page 1090 
and demands for bodily injury . . . arising out of the work undertaken by [Star]." The general rule is that, "if indemnity is sought against an indemnitor without notice of either the original suit or of the settlement by the indemnitee," then the indemnitee has the burden of establishing that it was actually liable to the plaintiff and that the settlement was a reasonable one. Watts v. Talladega Fed. Sav. Loan Ass'n, 445 So.2d 316, 320 (Ala.Civ.App. 1984). However, if the indemnitor has been given notice of the action against the indemnitee and has been given an opportunity to defend or to settle the action, then the indemnitor "is precluded from contesting the indemnitee's liability in a subsequent indemnity or third-party action." Id.
 "Indemnity against losses does not cover losses for which the indemnitee is not liable to a third person, and which the indemnitee improperly pays. A person legally liable for damages who is entitled to indemnity may settle the claim and recover over against the indemnitor, even though he has not been compelled by judgment to pay the loss. In order to recover, the indemnitee settling the claim must show that the indemnitor was legally liable, and that the settlement was reasonable. In the event that an indemnitor is not afforded the alternative of participating in a settlement or conducting the defense against the original claim, an indemnitee settling the claim will have the burden of establishing actual liability to the original plaintiff rather than the lesser burden of showing potential liability.
 "However, when the indemnitor has notice of the claim and refuses to defend, the indemnitor is bound by any good faith reasonable settlement, and the indemnitee need only show potential liability.
 "Practice guide: A practical device by which an indemnitee can protect against the awkward possibility of having to prove the original plaintiff's case against himself, the original defendant, is to offer the indemnitor before any settlement is concluded the choice of (1) approving the settlement or (2) taking over the defense of the case and agreeing to hold the indemnitee harmless in any event for damages which may be assessed against him in excess of the amount of the proposed settlement. If the indemnitor approves the settlement or defends unsuccessfully against the original claim, the indemnitor cannot later question the indemnitee's liability to the original claimant. If the indemnitor declines to take either course, then the indemnitee will only be required to show potential liability to the original plaintiff in order to support his claim over against the indemnitor."
41 Am. Jur. 2d Indemnity § 46 (1995) (footnotes omitted).
Star next argues that Stone did not afford Star an opportunity to participate in the settlement negotiations with Cline. The record contains substantial evidence to the contrary. First, Star learned of Cline's claims when Cline sued Star in 1993. Second, Star is charged with knowledge of its obligation to indemnify Stone as provided by the 1990 subcontract between Star and Stone. Third, Star learned of Stone's intent to seek indemnification when Stone cross-claimed against Star in 1997. Fourth, Star itself had participated in mediation with the Clines. Fifth, Stone had, by its March 13, 1998 letter, demanded that Star settle the Clines' claims and "indemnify, hold harmless, and otherwise exonerate Stone. . . ." Star had rebuffed this demand by Stone. Sixth, Stone had, by its July 23, 1998 letter, supplied Star the details of the Clines' settlement demand and had demanded again that Star *Page 1091 
settle the Clines' claims and indemnify, exonerate, and hold harmless Stone pursuant to the subcontract. Star had ignored this second pre-settlement demand letter. Thus, the record contains substantial evidence that Stone provided Star notice and opportunity to participate in the negotiations which culminated in Stone's August 1998 settlement with the Clines.
Finally, Star argues that Stone was too tardy in notifying Star of the Clines' suit and of Stone's demand for indemnification under the contract. On the one hand, Stone was tardy in notifying Star. In fact, by the time Stone notified Star by cross-claiming against Star, Star itself had already been sued by the Clines. On the other hand, Star has not pleaded or argued, much less demonstrated, that it was prejudiced in any way by Stone's tardiness. Indeed, Star's motion to dismiss Stone's cross-claims, denied by the trial court on January 30, 1998, asserted that Stone's cross-claim for indemnification was premature, not tardy. There Star asserted that Stone's claim for indemnification would not even accrue unless and until the Clines won their claim for damages against Stone. Neither this motion to dismiss nor any other motion or pleading filed by Star challenged Stone's delay in notifying Star of the Clines' suit or Stone's delay in demanding indemnification from Star; and no motion or pleading filed by Star mentioned or suggested any prejudice to Star from Stone's delay. The absence of any claim or proof by Star that it suffered any prejudice from Stone's tardiness is the distinguishing feature between the case now before us and the similar case of CochraneRoofing Metal Co. v. Callahan, 472 So.2d 1005 (Ala. 1985), cited by Star. In Cochrane, unlike in the case before us, the indemnitor, a roofing subcontractor, pleaded and proved without contradiction that, because of the delay of the indemnitee, the general contractor, in notifying the indemnitor of the suit for defective roofing, "the roof, the subject of the suit, had been re-covered by another contractor, preventing the subcontractor [the indemnitor] from investigating the problem." 472 So.2d at 1007. See Restatement (Second) of Judgments § 57, cmt. e ("The notice must be timely in that it must not come so late that the indemnitor is prejudiced in preparing the defense . . . ."). Conversely, tardiness without prejudice provides no defense.
In summary, Star has demonstrated neither the absence of genuine issues of material fact nor a right to judgment as a matter of law on Stone's claim for indemnification for the $495,000 in settlement money paid by Stone to the Clines. Accordingly, summary judgment on this claim is not authorized by Rule 56, Ala.R.Civ.P.
 C. The Duty to Indemnify Stone for the Expenses of Defense
In pertinent part, the subcontract between Stone and Star required Star to "indemnify and save harmless and exonerate" Stone from certain claims.
 "We are aware that it appears to be well settled in other jurisdictions that an indemnitee is entitled to recover, as part of the damages, reasonable attorney fees which it is compelled to pay as a result of suits against it in reference to the matter against which it is indemnified. 42 C.J.S. Indemnity § 13(d) (1968). The indemnification of attorney fees is, however, subject to certain limitations. For instance, the allowance of attorney fees is limited to the defense of the claim indemnified against and does not extend to services rendered in establishing the right of indemnity. 41 Am.Jur.2d Indemnity § 36 (1955); see, e.g., United General Ins. Co. v. Crane Carrier Co., 695 P.2d 1334 (Okla. 1984); [E.C.] Ernst, *Page 1092 
[Inc. v. Manhattan Constr. Co., 551 F.2d 1026 (5th Cir. 1977)].
 "Furthermore, there is considerable authority holding that an indemnitee is precluded from recovering attorney fees where the indemnitee has been required to defend accusations which encompass his own separate wrongful acts. See, e.g., Farr v. Armstrong Rubber Co., 288 Minn. 83, 179 N.W.2d 64 (1970); Piedmont Equipment Co. v. Eberhard Mfg. Co., 99 Nev. 523, 665 P.2d 256 (1983). In other words, indemnification, including attorney fees, is allowed where one is defending claims predicated solely upon another defendant's negligence; however, where one is defending for his own benefit, an award of attorney fees will not be allowed."
Jack Smith Enters. v. Northside Packing Co., 569 So.2d 745, 746
(Ala.Civ.App. 1990) (emphasis in original). See generally Winn-DixieMontgomery, Inc. v. Stimpson, 574 So.2d 782, 783-84 (Ala. 1991) (indemnity agreement providing that "[Winn-Dixie] agrees to indemnify and save harmless the Landlord from any claim or loss" entitled Winn-Dixie to indemnification "for all expenses incurred as a result of the judgment . . ., including a reasonable attorney fee"); and Freeman Wrecking Co. v.City of Prichard, 530 So.2d 235, 236 (Ala. 1988) (indemnity agreement providing that "[t]he City of Prichard agrees to hold FREEMAN WRECKING COMPANY, INC., harmless, and shall further indemnify it for any liability" entitled the indemnitee to an award of attorney fees). Thus, Stone's right to indemnification by Star extends to Stone's expenses of defense, including attorney fees, attributable specifically to Stone's defense against the Clines' claims and accruing after, and only after, Stone demanded indemnification from Star. Accordingly, the summary judgment, insofar as it denies Stone any recovery for attorney fees and other expenses of defending the Clines' claims, is due to be reversed.
 III. Conclusion
For the reasons stated, the summary judgment is affirmed insofar as it adjudicates in Star's favor the claims of Stone relating to Star's failure to provide liability insurance coverage to Stone. The summary judgment is, however, reversed insofar as it adjudicates adversely to Stone its claim against Star for indemnification for the $495,000 in settlement money Stone paid to the Clines and Stone's claim against Star for the expenses of defense, including attorney fees; and the case is remanded to the trial court for proceedings on those claims consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
Hooper, C.J., and Maddox, Cook, and Lyons, JJ., concur.
[1] The litigation began on July 2, 1992 when Cline sued 4 Star Electric and fictitious defendants A, B, C, X, Y, and Z. Although they have similar names, 4 Star Electric is a completely separate entity from Star. Cline added Stone as a defendant on September 9, 1992 and added Star as a defendant on March 2, 1995. On June 5, 1995, the trial court granted 4 Star's motion for summary judgment. 4 Star began Chapter 7 bankruptcy proceedings on December 21, 1995. (C.R. 365.) Stone and Star (not 4 Star) are the only parties to this appeal.
[2] Stone also alleged fraudulent suppression and conspiracy to defraud. However, Stone has abandoned those claims on appeal.